GRAPHIC ARTS INTERNATIONAL
UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Newspaper Agency Corporation,
Intervenor.

No. 73–1372.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 8, 1974.

Decided Aug. 13, 1974.

Samuel Edes, Chicago, Ill., for petitioner.

Russell H. Gardner, Atty., National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliot Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.

James S. Lowrie, Salt Lake City, Utah, with whom Donald B. Holbrook, Salt Lake City, Utah and Morris J. Levin, Washington, D. C., were on the brief, for intervenor.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIES,* United States Senior District Judge for the District of North Dakota.

MacKINNON, Circuit Judge:

Graphic Arts International Union (the Photoengravers) petitions under section 10(f) of the National Labor Relations Act (the Act), as amended,[1] for review and modification of a decision and order of the National Labor Relations Board (the Board) entered against Newspaper Agency Corporation (the Newspaper). 201 N.L.R.B. No. 91 (Jan. 29, 1973). The Newspaper publishes and distributes two daily newspapers in Salt Lake City, Utah. Its employees are represented by several unions, including the Photoengravers and the Salt Lake Web Pressmen's Union (the Pressmen). The Board concluded that the Newspaper had committed certain unfair labor practices and ordered affirmative action to remedy the violations. Finding the Board's decision supported by substantial evidence, we affirm.

## I

The genesis of this case was the decision of the Newspaper to modernize its plant by converting to the so-called direct printing process. To understand the arguments advanced by the parties, we need to compare the old printing method with the new direct printing process.

Newspapers contain both non-pictorial material such as news stories, classified advertisements and editorials, and pictorial material such as news photographs and advertisements. Under the old printing method the non-pictorial material was set in type by a "hot type" process. Since pictorial material could not be converted into type lines, it was assembled in the composing room into "paste-up" form. The paste-up was then transferred to the engraving room where the Photoengravers photographed the paste-up and prepared negatives of the image. If several negatives had to be combined to form a particular advertisement, the Photoengravers performed the process known as "stripping." The next step, also performed by the Photoengravers, was to "burn" the image onto a photosensitive plate. Thereafter the Photoengravers etched away the non-image bearing portions of the plate, leaving the image bearing areas of the plate in relief form. After the plate was trimmed and cut by the Photoengravers, it was returned to the composing room where it was combined with other plates and type lines to form a full page. This "dummy page" was then sent to the stereotype department which prepared a "press plate" from molten lead. The press plate was dispatched to the press room where the Pressmen affixed the plate to the press and printed the newspaper.

The direct printing process incorporates more automated equipment and streamlines preparation of the printing plate. In the direct printing process, composing room employees assemble both pictorial and non-pictorial material into full-page paste-up form. The paste-ups are sent to a combination platemaking and press department where

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 29 U.S.C. § 151 et seq. (1970) (61 Stat. 136, 73 Stat. 519). Section 10(f) provides:

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside . . . [T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

29 U.S.C. § 160(f) (1970).

they are photographed by an automated camera. The image on the negative is then transferred onto a thin photosensitive plate and this plate is mounted directly on the press.

There are several apparent differences in the organization and operation of the Newspaper's plant under the old and new printing methods. For example, the direct printing process utilizes a new camera to photograph the full-page paste-ups which is more fully automated and is capable of using distortion to achieve special effects. Further modernization results from the direct printing plates being pre-coated with photosensitive material, thus eliminating the need for hand coating which the old process required. With the new process, it is unnecessary to return the pictorial plates to the composing room to be combined with the non-pictorial material, and the stereotypers' function of preparing press plates from molten lead is eliminated. Instead, a single plate is prepared using pictorial and non-pictorial material simultaneously, and that plate is mounted directly on the press without further preparation.

The increased efficiency and altered work assignments which result from these technological improvements enable the reorganization of employee units within the plant. Thus, with the incorporation of direct printing the Newspaper planned to consolidate the camera, platemaking and printing operations into an expanded "press department." The operations within this new department would be spatially consolidated within the same general area. Moreover, because the automated equipment requires less skill, the employees could and would be trained in all phases of the work performed in the new department, thus enabling the employees to be used interchangeably within the department and to be under common supervision.

Preparing for the conversion to direct printing, the Newspaper negotiated with the Pressmen concerning the labor relations aspect of the conversion. These negotiations resulted in a contract under which the Newspaper agreed to recognize the Pressmen as the representative of all employees in the new press department and the Pressmen agreed to give up the press manning work rules which in the past had restricted the ability of the Newspaper to rotate employees between different tasks.

Only after negotiating this contract with the Pressmen did the Newspaper approach the Photoengravers concerning the impact of the conversion on the employees who were members of their union. The Photoengravers objected to their representation being transferred to the Pressmen and maintained that their craft skills would remain independent and identifiable after the conversion to direct printing. Throughout the negotiations, however, the Newspaper insisted that any contract with the Photoengravers would exist only until the conversion occurred because the Newspaper had already agreed to recognize the Pressmen as the representative of all employees in the new press department. Faced with this impasse, the Photoengravers filed unfair labor charges against the Newspaper with the Board. After such charges were filed the Newspaper informed the photoengraving employees that they would not be employed in the new press department so long as the unfair labor charges filed by their union remained pending before the Board.

After an evidentiary hearing the Board concluded that the new press department, as planned, would constitute a new employee unit over which no union could claim prospective recognition, and that the Newspaper violated section 8(a)(2) of the Act[2] by extending prema-

---

2. (a) It shall be an unfair labor practice for an employer—

. . . . .

(2) to dominate or interfere with the formation or administration of any labor organization . . . .

29 U.S.C. § 158(a)(2) (1970).

ture recognition to the Pressmen. The Board further concluded that by conditioning agreement with the Photoengravers upon their acceptance of Pressmen representation, and by conditioning the Photoengravers' employment in the new press department upon their withdrawing the charges before the Board, the Newspaper violated sections 8(a)(1) and (5) of the Act.[3] To remedy these violations the Board ordered the Newspaper to withdraw the premature recognition of the Pressmen; to continue bargaining with the Photoengravers until the point of full conversion, at which time the representation issue could be resolved in an appropriate proceeding; to refrain from conditioning agreement with the Photoengravers upon a requirement that they accede to representation by the Pressmen; and to cease informing employees that transfer into the new press department depended on the Photoengravers withdrawing the unfair labor charges before the Board.

The Board pointed out, however, that the decision of the Newspaper to convert to direct printing was a non-discriminatory business judgment which was not motivated by any anti-union animus, and therefore refused to overturn the Newspaper's decision to convert. Moreover, since the Board found that neither the Pressmen nor the Photoengravers could presently claim representation rights for the planned press department, the Board refused to conclude that the Newspaper unlawfully withdrew recognition from the Photoengravers. Nor did the Board accept the Photoengravers' contention that they should continue to represent all employees engaged in the camera and platemaking operations in the new department. Rather, the Board indicated that representation of employees in the new department should be resolved in a proceeding under section 9 of the Act.[4]

II

The Photoengravers' fundamental position throughout this dispute has been that separate craft units for photoengraving and for printing will continue even after conversion to direct printing. Their primary objection is to the conclusion of the Board that a new employee unit would be created by the conversion, a conclusion which they contend was unnecessary to the Board's decision and unsupported by substantial evidence. However, the issues raised by the Photoengravers did require the Board to determine the nature of the planned new department, and there is substantial evidence to support the Board's conclusion

3. (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. §§ 158(a)(1), (5) (1970).

4. (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section; or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section;

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

29 U.S.C. § 159(c) (1970).

that a new employee unit would arise upon full conversion.

In defending against the unfair labor charges before the Board, the Newspaper argued that the new press department would be formed merely by accretion to the existing press room. The Photoengravers argued in opposition that separate craft units would survive for platemaking and printing. Although the Board ruled against the Newspaper in rejecting the accretion argument, the Board did not go so far as to accept the Photoengravers' argument for continued separate crafts. Rather, the Board explained that the plans of the Newspaper, if carried out, would create a new employee unit which would overlap several operations, including platemaking and printing.

The Photoengravers maintain that the Board's conclusion that a new unit would arise was unnecessary because, to support the unfair labor violation which the Board found to have occurred, the Board need only have rejected the accretion argument as made by the Newspaper. According to the Photoengravers, the Board properly rejected the accretion argument but improperly offered the gratuitous observation that the planned press department would constitute a new employee unit. In other words, according to the contention of the Photoengravers, the Board should have stated what the new department would not be, without stating what it would be. However, it was certainly reasonable for the Board to explain the nature of the new department, as conceived, in order to explain why the new department could not be considered the product of accretion. While the conclusion that a new unit would arise was not absolutely essential to the finding that certain unfair labor violations existed, it was extremely helpful in understanding the rationale of the Board.

In any event, the conclusion that a new unit would arise was essential to another aspect of the Board's decision.

In addition to the unfair labor charges as upheld by the Board, the Photoengravers charged that the Newspaper unlawfully withdrew recognition from the Photoengravers. This charge hinged upon the contention that separate craft units would continue in the new department. If separate craft units did not continue, then there was no prior recognition which could be withdrawn. In rejecting the charge that the Newspaper unlawfully withdrew recognition, it was essential for the Board to conclude that separate craft units would not continue but a new unit would emerge. Thus the finding that the planned conversion would create a new employee unit was a necessary response to the Photoengravers' unfair labor charges.

III

■ Since the finding of a new employee unit was essential to the Board's decision, we must determine whether that finding is supported by substantial evidence on the record considered as a whole.[5] The Photoengravers argue that separate craft units will continue after conversion to direct printing because both the old and the new procedures embody the same underlying scientific process of platemaking. That is, the employees must still photograph the material, develop a negative, transfer the image to a photosensitive surface and remove the unexposed areas to form a printing plate.

While it is true that the underlying scientific principles remain the same, the practical application of those principles is different under the direct printing method. The Photoengravers' emphasis on the scientific principles ignores other simplifying changes wrought by technological advancement and plant reorganization which materially affect the work and working conditions of the employees. Recognizing that many of the same functions occur in both the old and the new printing methods, the Board concluded that other changes in

5. *See* note 1 *supra.*

working conditions justified treating the new press department as a new employee unit. For example, advancing technology has reduced the skill necessary in the platemaking operation, enabling the same employees to be trained to operate both the presses and the platemaking equipment. Consequently, the employees will be trained in all phases of the work performed in the new press department and will be rotated among the various operations on a short term basis as the need arises. The employees in the new unit will be located in the same general area and will be under common supervision.

The Board was entitled to rely on these changed factors in rejecting the Photoengravers' contention that separate craft units would continue after conversion. Although the basic principles of platemaking remain the same, advanced technology has altered the employees' role in the process. In view of this new role, the Board could properly conclude that employees who rotate among the same tasks, who are under common supervision and who therefore experience the same working conditions, should be treated as a homogeneous unit and not as a series of fragmented groups.

## IV

The Photoengravers further assert that the Board relied on inaccurate information in determining that a new employee unit would arise. They contend that the Board improperly based its decision on the Newspaper's speculation concerning the prospective plant operation and that the new press department in fact did not develop as planned. A month after the Board's final decision the Photoengravers petitioned the Board to reopen the record to receive evidence of the actual plant operation under the direct printing method, but the Board denied the petition.

It is important to remember that this case was before the Board in the context of an unfair labor charge, not as a representation proceeding. The unfair labor charge focused on the conduct of the Newspaper during the period when it was preparing the plant for conversion to direct printing. In resolving the unfair labor issues the Board relied on the facts at the time of the alleged unfair labor practices, that is, during the planning stages of the conversion. Those facts necessarily included the plans of the Newspaper for future plant reorganization. Since the unfair labor charge depended to a large extent on the Newspaper's plans as they existed at that time, the Board properly relied on those plans in resolving the unfair labor charges.

The Board's decision regarding the anticipated formation of a new employee unit was necessitated by the Photengravers' insistence that separate craft units would continue after the conversion to direct printing. As explained in section II, *supra*, this issue was central to the allegation that the Newspaper unlawfully withdrew recognition from the Photoengravers. But in resolving this unfair labor charge, the Board did not determine that the new unit would in fact be the appropriate unit for union representation. The Board expressly reserved the representation issue for a section 9 proceeding [6] in which the parties would have the opportunity to present evidence regarding the actual plant operation after conversion.

It appears that the Photoengravers have now had the opportunity at a representation proceeding to present current evidence concerning the actual plant operation after the conversion to direct printing. Subsequent to oral argument in this court, on May 2, 1974, the regional director issued his decision concluding that the new press department constituted an appropriate unit for representation purposes. The regional director's decision evidences his consideration of current evidence which was not before the Board at the time of the unfair labor proceedings. Thus, the regional director noted that the Employer had in-

6. *See* note 4 *supra.*

stituted a program to train all employees in the new press department to perform all the tasks encompassed by that department, that as of March 1974 over 68 percent of the employees in the press department had been trained in all job functions, and that the Newspaper rotates employees between the various operations in the new department to the extent possible. The only employees who will not be cross-trained and rotated are those who are physically disabled or who will retire within two years. Although there is a separate "leadman" for the platemaking and press areas, the entire press department operates under the common supervision of a supervisor, a foreman and an assistant foreman.

The regional director further found that there is no interchange of employees between the press department and other employees within the plant and that the employees in the new press department share a community of interest because they work on the same pay scale and receive the same fringe benefits. For these reasons the regional director concluded that the actual plant operation after the conversion "differs in only minor respects" from the anticipated operation described in the Board's unfair labor decision.

■ It is evident from the factors relied on by the regional director that the Photoengravers had the opportunity in an appropriate proceeding to litigate the facts concerning actual plant operation. The reliance on projected plant operation in the unfair labor proceeding did not foreclose investigation into the actual plant operation in the representation proceeding.

### V

Finally, the Photoengravers challenge the measures ordered by the Board to remedy the unfair labor practices committed by the Newspaper. The Photoengravers agree, of course, with the Board's order requiring that the Newspaper withhold recognition from the Pressmen as representative of the new unit unless and until certified in an ap-

propriate proceeding. Nor do the Photoengravers disagree with the Board's decision to permit the Newspaper to convert to direct printing, since the conversion resulted from a nondiscriminatory business judgment without anti-union animus.

■ However, in an indirect attempt to thwart the conversion, the Photoengravers suggest that the manning provision should be restored to the contract between the Newspaper and the Pressmen because the Newspaper secured the elimination of that provision as the quid pro quo for unlawfully recognizing the Pressmen as the representative of the new press department. We do not agree that this relief is required. Since the Newspaper acted without anti-union animus in deciding to convert to direct printing, the purpose of the Board's remedy was not to interfere with the conversion but to nullify the impact on the employees of the premature recognition of the Pressmen by the Newspaper and its unlawful practices in negotiating with the Photoengravers. The Pressmen do not object to the elimination of the manning provision in their contract, even though the Newspaper rescinded the recognition provision. The Board reasonably exercised its discretion in ordering the Newspaper to withdraw its recognition of the Pressmen and to continue bargaining with the Photoengravers, and the Board was not required to examine and rewrite the Pressmen's entire contract in an attempt to nullify such a tangential consequence as the elimination of the manning provision.

The Photoengravers primarily disagree with the Board's order that the Newspaper continue to bargain with the Photoengravers "as the exclusive representative of its employees in the engraving room unit . . . *until the point of full conversion* to one hundred percent photocomposition using direct photosensitive printing plates." Jt.App. at 71 (emphasis added). The Photoengravers maintain that instead of specifying the time at which their representation would cease, the Board should have ordered continued recognition of

the Photoengravers until some unspecified time at which changed conditions require a new unit determination.

 Specifying the time at which the separate craft units would cease to exist was a reasonable and natural consequence of the Board's earlier conclusion that a new employee unit would arise at the point of full conversion, a conclusion which was necessitated by the Photoengravers' unfair labor charges. Even assuming that the Board somehow erred in requiring the Newspaper to recognize the Photoengravers only until the point of full conversion, we would not now require the Board to amend its order. The time for full conversion has passed and a different proceeding has determined that a new unit exists for representation purposes. It would be pointless at this time to modify a segment of the Board's order which relates to an interim period long since past.

We accordingly affirm the decision and order of the Board.

Judgment accordingly.